WILLIAM SANDERSON & another *vs.* J. B. BROWN & others.

The plaintiffs contracted in writing to cut and haul from the "Dartmouth College Grant," and drive and deliver into the defendants' boom, "in the spring of 1867, from three to five million feet of spruce logs," of a specified description, "and all the pine timber they can obtain from said grant." In the same instrument, the defendants agree to pay the plaintiffs seven dollars per M. for the spruce, and eleven dollars per M. for the pine, "when scaled and delivered in said boom;" "to advance from time to time such sums, not exceeding one-half the amount to be paid for the logs, as the plaintiffs may need in the prosecution of the work;" and "in case any logs cut on said grant are not delivered in their boom as aforesaid," the defendants "are to retain in their hands, at the rate of one dollar per M. on account of said logs." In an action to recover the price stipulated, *Held*, (1) That the plaintiffs were entitled to recov-

er the full prices for all lumber cut and delivered by them into the defend-
ants' boom in the driving season of 1867; and (2) The same prices, less one
dollar per M. for all timber cut, hauled, and properly landed by them, but which
remain undriven, without any want of reasonable diligence on their part.

No action can be maintained for services rendered without the knowledge, or
request, express or implied, of the defendant, notwithstanding he verbally
promised to pay therefor, after their rendition.

ON EXCEPTIONS AND MOTIONS.

ASSUMPSIT, on a special contract for cutting and hauling timber
from " Dartmouth College Grant," in New Hampshire, and driv-
ing a portion of it into the defendant's boom in Milan, New Hamp-
shire. The essential part of the contract, together with the
instructions, may be seen in the opinion.

The writ contained a special count on the contract, and also a
count on an account annexed, embracing, along with the items of
cutting, hauling, marking, and driving from Dartmouth College
Grant, 4,090,136 feet spruce timber into Milan boom, at seven
dollars per M. ; 274,988 feet pine timber, at eleven dollars ; cut-
ting, hauling, marking, and landing 30,000 feet pine timber on
Diamond rivers and Abbott brook, at ten dollars ; cutting, hauling,
marking, and landing 1,100,000 feet of spruce, at same place, at
six dollars per M. ; sundry charges for driving old logs from differ-
ent localities on the Androscoggin river and its tributaries, among
which was an item of " $160 for driving Winslow & Foster tim-
ber into Milan boom." The debit side of the account amounted
to $44,769.24. The credit, embracing numerous items of cash
and supplies, etc., amounted to $33,782.63, leaving a balance of
$10,976.61. The credit side of the account did not contain an
item of $1000, ordered and sent by express in January, 1867, or
of $490.24 paid by the defendants for toll on the timber actually
driven.

It appeared on the part of the plaintiffs that in December, 1866-7,
they put 100 oxen and 150 men to hauling, cutting, marking, and
landing pine and spruce timber on the Abbott brook, Dead Dia-
mond, and Swift Diamond rivers, tributaries of the Androscoggin;
that they worked until March 20, 1867, when their teams and men

were taken out; that they agreed to drive out certain old logs belonging to the defendants, and situated at different places along with their new ones, at the rates charged; that before the streams opened they, with thirty drivers, went to the landings prepared to drive; that there were no rains to raise the water to a driving pitch, and the snow wasted away without materially raising the streams; that they cut, hauled, and drove the amounts charged, and cut, hauled, and properly landed the several amounts charged in their account; and drove the old logs at a fair price, except the item of $160 concerning which there was no contract; and that about two-thirds of all that was cut by plaintiffs, were driven by them to the defendants' boom.  Only a portion of the items was contested by the defendants.  There was evidence introduced by the defendants, tending to show that the plaintiffs agreed to drive the old timber at cost; that too much timber was landed on Abbott's brook, more than could be driven in such a stream; and that the plaintiffs, having refused to drive after season of 1867, the defendants hired others to drive what the plaintiffs left.  The defendants also introduced evidence as to the cost of driving these streams.

The jury returned a verdict for the plaintiffs for $9,329.91, which the defendants moved be set aside as being against law, and the weight of evidence, and the defendants also alleged exceptions to the instructions.

*J. & E. M. Rand,* for the defendants.

*Howard & Cleaves,* and *D. R. Hastings,* for the plaintiffs.

APPLETON, C. J.  On 17th September, 1866, the plaintiffs, and defendants, under the name of the Berlin Mill Company, entered into a contract, by the terms of which the plaintiffs agreed " to cut and haul from the Dartmouth College Grant in New Hampshire, and to drive into the boom of the said Berlin Mill Company, in the spring of 1867, from three to five million feet of spruce logs " of a specified description, and " to cut, haul, and deliver all the pine timber they can obtain from said college grant; said pine logs to

be good sound timber, to be marked the same as spruce logs, and to be delivered at the said time and place as the spruce."

The defendants " contract and agree to pay to the said W. & M. Sanderson, seven dollars per thousand feet, board measure, for said spruce logs when scaled and delivered in said boom, and to pay for said pine logs the sum of eleven dollars per thousand feet, board measure, when scaled and delivered as aforesaid, which sums are to be in full for said logs, payment to be made as follows : The Berlin Mill Company agree to advance to said W. & M. Sanderson, from time to time, such sums as they may need in the prosecution of their work, not to exceed one-half the amount to be paid for said logs, for which advances interest is to be allowed at the banking rates ; and the said Berlin Mills Company, in case any logs cut on the said college grant, are not delivered in their boom at Milan, as aforesaid, are to retain in their hands at the rate of one dollar per thousand feet, on account of said logs."

" The spring of 1867 " was the time fixed for the delivery of the logs to be cut and run by the plaintiffs to the defendants' boom. Any one acquainted with lumbering operations knows that all the logs are rarely if ever driven in the spring after they are cut. The success of the driving depends, in a great degree, upon the quantity of the water in the spring freshet. There may be too much or too little.

The contract assumes the existence of the contingency that a portion of the logs may remain behind, and makes provision therefor. It provides, " in case any logs cut on said college grant are not delivered in their (defendants') boom at Milan, as aforesaid, the defendants are to retain in their hands, at the rate of one dollar per thousand feet, on account of said logs." They are to retain one dollar. This implies the payment of the remainder. The authority to retain this sum impliedly negatives the right to retain more. The claim of the defendants is, that all the logs must be delivered before the plaintiffs can recover. But if this be so, then the defendants would be authorized to retain not the one dollar, but the whole amount remaining due, which is directly adverse to the terms of the con-

tract, for by that, one dollar is retained in the event of the happening of the anticipated contingency and no more.

Further, the retention is to be in case the logs are not delivered " as aforesaid," that is to say," in the spring of 1867." Reference, it will be perceived, is made to the time specified for the delivery of the logs, and the completion of the contract on the part of the plaintiffs. While an entire and complete performance, by the delivery of all the logs cut under the contract is not anticipated, provision is made for those cut, but not delivered, by authorizing the retention of a specified sum, and impliedly requiring the payment of the balance.

The presiding judge instructed the jury " that if the plaintiffs deliberately abandoned the contract, and refused to comply with its terms, they would not be entitled to recover anything under it." To this the defendants assuredly cannot object.

He further instructed them, that " in order to enable them to recover under that part of the contract which provides for the lumber cut, hauled, landed, but not delivered in the Milan boom, they must use necessary diligence in the spring of 1867, and during the driving season of that year, to get the lumber to the boom. Necessary diligence is that degree of diligence which men, ordinarily engaged in and acquainted with that kind of business, would use in their own affairs. Such diligence as you would find in the average of men, engaged and acquainted with that kind of business. If they neglected to use this degree of diligence, then it would be an abandonment of their contract, and they could not recover under it." This instruction assumes the right to recover, though all the logs are not delivered in the boom, in the spring of 1867. But as before seen, the contract contemplates that all might not be so delivered and provided for that contingency by authorizing the retention of a portion of the contract price. But the plaintiffs were bound to use all reasonable diligence to prevent, as far as possible, any logs remaining undriven. If, however, logs so remained without negligence on the part of the plaintiffs, they were entitled to recover the contract price, save what by its terms the defendants

were allowed to retain. This sum was obviously retained as compensation for any expense the defendants might subsequently incur in driving the logs.

For the charge of $160 in the plaintiff's bill, it is claimed that there was no contract. In relation to this the instruction given was as follows: " When, without any agreement, services are rendered to another, with his knowledge and consent, and without objection, then the party is to receive a reasonable compensation. In order to be an implied contract, it must be at least with the knowledge and consent of the party receiving the services. If, subsequently, however, to the performance of the services, it was brought to their knowledge, and they promised to pay for it, the law would hold them responsible."

In *Weston* v. *Davis*, 24 Maine, 375, Shepley, J., says: "When one performs services for the benefit, and with the knowledge and tacit consent of another, the law implies a promise to pay a reasonable compensation for them. Such promise, however, is implied only." But no action can be maintained on a past consideration, unless alleged at the request of the promisor. *Allen* v. *Woodward*, 22 N. H. 544. *Wilson* v. *Edmunds*, 24 N. II. 517. *Bartholomew* v. *Jackson*, 20 Johns. 28. The last clause in the instruction implies, that an action may be maintained, when the services were rendered without the knowledge or request express or implied of the defendants, if, after their rendition, there was a promise to pay. But a past and executed consideration, without knowledge or request, is no sufficient basis for a promise to pay. It may afford evidence from which the jury may infer a request. It is the province of the jury to determine from the evidence, whether a promise can be inferred or not. *Oatfield* v. *Waring*, 14 Johns. 188.

The evidence shows satisfactorily that the $1000 sent in answer to the order of Jan. 18, 1867, was not allowed by the jury, nor the sum of $490.24, which the defendants paid for tolls, and of which the plaintiffs had the benefit.

New trial granted unless plaintiffs will remit $1650.24, said sums being $1000 cash sent them, and 490.24 paid for tolls, and interest

from the date of their payment, and the bill for driving of $160, with interest from the date of their writ.

CUTTING, DICKERSON, BARROWS, and DANFORTH, JJ., concurred.